### MURRAY v. JOSEPH et al.

(District Court, S. D. New York. February 21, 1906.)

1. EVIDENCE—PRESUMPTIONS—INFERENCES FROM FAILURE TO PRODUCE EVIDENCE.

If a party to a cause fails to produce evidence which in the opinion of the jury he could produce in support of his position if his testimony, which is contradicted, is true. the jury is justified in drawing the inference from such omission, either that there is no such evidence that can be produced, or that if it was produced it would not be favorable to such party.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 97.]

2. JUDGMENT—MATTERS CONCLUDED—ORDER OF BANKRUPTCY COURT.

An order made by a court of bankruptcy in summary proceedings therefor, refusing to direct a third person to turn over to the trustee money and property of the bankrupt, claimed to be in the possession or under the control of such third person, is not a bar to a subsequent action by the trustee against such person to recover the value of such money and property, on the ground that it was transferred to defendant by the bankrupt with intent to hinder, delay, and defraud his creditors.

3. BANKRUPTCY—ACTION BY TRUSTEE—FRAUDULENT TRANSFER OF PROPERTY.

Evidence reviewed in a charge to the jury in an action by a trustee in bankruptcy against the bankrupt and another to recover the value of money and property alleged to have been fraudulently transferred by the bankrupt to his codefendant and to others through a conspiracy between defendants.

The complaint was based upon section 67e of the United States bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 564, 565 [U. S. Comp. St. 1901, p. 3450]). The specific charges were: That the two defendants entered into a conspiracy to defraud the creditors of Gilroy & Bloomfield; that in pursuance of this conspiracy Joseph, an attorney, aided Gilroy in transferring assets beyond the reach of creditors; that on March 19, 1904, and within four months of the filing of the petition in bankruptcy, in pursuance of the scheme, Gilroy transferred to Joseph certain firm property, consisting of 64 pieces of woolens, of the value of $4,500, and firm money; the latter amounting to $1,250. Defendant Gilroy, in his answer, admitted the transfers to Joseph, but denied the allegation of fraud and conspiracy. He alleged the transfers were made upon the advice of his attorney, Joseph, and that said Joseph assured him that the proceeds would be used solely for the purpose of effecting a settlement with creditors. Defendant Joseph denied the conspiracy, and denied the receipt of the woolens and money. As a plea in bar of further proceeding, Joseph set up an order entered by the district judge on the report of a referee, which order dismissed the proceedings as to Joseph. and required D. L. Feinman, Rosie Korn, and Tobias Korn, the other respondents therein, to pay over certain sums to the receiver.

Bird & Tarbox (Abram I. Elkus, of counsel), for plaintiff.
Arthur Furber (Arthur Palmer, of counsel), for defendant Joseph.
Paul M. Herzog, for defendant Gilroy.

HOLT, J. (charging jury). This action is brought by the trustee in bankruptcy of the firm of Gilroy & Bloomfield against Abraham A. Joseph and Louis K. Gilroy; Gilroy having been a member of the firm of Gilroy & Bloomfield, and Joseph being a lawyer who acted in some professional capacity in the matters to which the suit relates. The charge in the complaint is, in substance, that Gilroy and Joseph entered into a conspiracy to transfer property belonging to the firm of Gilroy

& Bloomfield, for the purpose of hindering, delaying, and defrauding the creditors of the firm. In another part of the complaint it is alleged that Joseph aided and abetted Gilroy in making a transfer of property, and that the property was transferred by Gilroy to Joseph for the purpose of hindering, delaying, and defrauding the creditors of the firm. The property alleged to have been transferred is a certain amount of cloth, which is alleged in the complaint to have been of the value of $4,500, and certain payments in cash amounting to $1,250, so that the complaint demands judgment for $5,750, with interest on it from March 19, 1904, which is the date on which it is alleged that the conspiracy took place to transfer this property. A conspiracy is defined in the law as an agreement between two or more people to do an illegal or criminal act, or to accomplish a legal act by criminal or illegal means. The charge here is a conspiracy to transfer property in fraud of creditors. A transfer of property with intent to hinder, delay, or defraud creditors is an illegal act under the state law. If it takes place before any bankruptcy occurs, it is an illegal act. If it takes place after bankruptcy occurs, and it is done knowingly and intentionally, it is a criminal act under the bankruptcy law, as well as an illegal act. In either case a trustee in bankruptcy has authority under the bankrupt act to bring a civil action to recover for the transfer of property, whether it is done in fraud of creditors before the bankruptcy occurs, or whether it takes place after the bankruptcy occurs. The plaintiff's claim generally in this case is that Gilroy transferred this cloth and cash to Joseph with intent to hide it and conceal it from the creditors. Gilroy's claim, as I understand it from his testimony, is that this was done to enable Joseph, as his attorney, to effect a settlement with his creditors. I suppose he would claim that the property was intended to be applied in that way, to settle with his creditors, and if the settlement was not accomplished, and if the estate had to be settled in bankruptcy, the property was to be turned back to the trustee. Joseph's claim, as I understand it, is, in substance, that this property was intended to be turned over to Mrs. Korn in payment of a debt, or upon account of a debt, and that the only part which he took in the transaction was as attorney for Mrs. Korn. It appears in evidence in this case that Mrs. Korn was a creditor of this firm. If a debtor owes a just debt to a creditor, he can pay that debt at any time before bankruptcy occurs, and making such payment is not a crime nor an illegal act. It may be a preference, and if bankruptcy occurs subsequently, and the payment has taken place within four months, with knowledge of the insolvency, and with reasonable ground on the part of the person who gets the payment to suppose it was intended as a preference, the trustee in bankruptcy can require it to be paid back; but there is nothing done which is illegal or criminal when a debtor pays a creditor, although he knows that by paying a particular creditor that creditor will get payment in full, and that the rest of his creditors will not. So that in this case, if you should come to the conclusion that all that Mr. Joseph was doing in this case was to endeavor to get Mrs. Korn's debt paid, and that all he did in that respect took place before the bankruptcy occurred, then you should find a

verdict in his favor in this case. But after the bankruptcy occurred, after the petition was filed, and the order appointing the receiver was made, then neither the person against whom the petition was filed nor Joseph nor anybody else would have any right to take the property of the bankrupt, and apply it to the payment of a particular creditor. The bankrupt's property under those circumstances belonged to the receiver, and was to be held by the receiver pending the adjudication in bankruptcy, and if the adjudication in bankruptcy took place, it was then to be applied ratably and equally to all the creditors, and not to some particular creditor to the prejudice of the others.

Now, in order to understand the bearings of the question which is presented to you, it is necessary to comprehend somewhat the general facts of this case, and if in stating those facts I state them in a way different from your own recollection of them, you must be guided by your own recollection; you are the judges of the facts.

It seems that this firm of Gilroy & Bloomfield were in business, and that along in January, I think in January or February, 1904, an arrangement was made by which Mrs. Korn put between $8,000 and $9,000 into the business. There was a man named Feinman who was a salesman in the employ of Gilroy & Bloomfield, who knew Mr. and Mrs. Korn, and he introduced them to the members of the firm of Gilroy & Bloomfield, and negotiations were entered into which resulted in Mrs. Korn putting into the firm this sum of between $8,000 and $9,000, and Mr. Korn being employed there. He was to be paid a salary, and Mr. Gilroy says he was to be paid also a percentage of the profits of the business, and at the time that this transaction took place, or subsequently, an assignment of certain accounts was made by the firm of Gilroy & Bloomfield to Mrs. Korn to secure this loan. Mr. Gilroy says that originally there was no agreement to give this assignment of accounts. He says she was to loan money in consideration apparently of the employment of her husband, and that the giving of the assignment was a subsequent suggestion.

The evidence of the other side is to the effect that it was all a part of the original arrangement, and that she was to have the assignment of these accounts as security for the repayment of this loan. At all events, it was subsequently executed, and a short time thereafter dissatisfaction seems to have arisen between the Korns in regard to this loan. They consulted Mr. Joseph on the subject, as they had originally consulted him in regard to getting the assignment, and they were in consultation with him thereafter. They claimed that they had been defrauded or deceived, asserting that some of these accounts had been pledged to banks. Mr. Gilroy says that it was only intended to give them an equity in these accounts as security, and that that fact was explained to them. At all events, without going further into detail in that matter, dissatisfaction arose. Joseph was consulted, and he advised them to say nothing; to let the business go on, and to draw out, on account of their claim, from the profits of the business as far as they could without making any attack. Then subsequently some altercation arose between Feinman and Bloomfield, Feinman

claiming that Bloomfield had been taking goods out of the business, and in that way affecting the interest of the Korns, which resulted in an altercation; so that generally, down, apparently, to about the middle of March, there was a condition of dissatisfaction and controversy there in this concern. Joseph says that he knew they were insolvent and that they were going to fail, and that things were getting worse and worse. At all events, the Korns went to Joseph's house along about Wednesday or Thursday before this Saturday, the 19th, as I understand it, and consulted him on the subject of securing their claim. This consultation resulted in Joseph's drawing a bill of sale, which has been produced here, signed Gilroy & Bloomfield, by Gilroy. Gilroy says when he signed it it only contained a transfer of three articles, silks, satins, and romaines. It now contains, in addition to these silks, satins, and romaines, a list of other property, and it practically includes all the assets in the store. Joseph says that after that was signed by Gilroy he took it up to Bloomfield's house. Bloomfield was ill. He wanted to have Bloomfield sign it, and Bloomfield declined to sign it, and thereupon he came back. Now, generally, of course, one partner could transfer firm property, but here was apparently a transfer of the entire assets of the concern, and it appears to have been understood by Josech that it would be desirable, at all events, to have both partners acquiesce in it; and it is admitted that Bloomfield did not. It is therefore for you to say what weight is to be given to this bill of sale; whether it was considered by the parties as an actual legal transfer of the property of this concern, or whether it was not; whether Bloomfield's refusal to sign it led the parties to not undertake to act under that bill of sale. At all events, on Saturday morning, the 19th of March, Mr. Joseph was sent for to come up to Gilroy & Bloomfield. I think he went first to the St. Clair House, and then went around to the store of the firm of Gilroy & Bloomfield. When he got there, he found that papers had been served on Gilroy in a suit brought in the state Supreme Court by Bloomfield for a dissolution of the partnership, and with it a notice of a motion was served for the appointment of a receiver. Mr. Gilroy called up Joseph, and consulted him about it, and gave him the papers, and the evidence would appear to be such as to justify you in finding that from that time on Joseph was acting as attorney for Gilroy or for the firm, as well as that he had previously been acting for Mrs. Korn. That is one of the questions in the case. If you think he was not acting as counsel for Gilroy, but was acting throughout as counsel for Mrs. Korn, simply representing a creditor here who was trying to get payment of a debt, then you will draw your conclusions accordingly. What occurred was that Joseph, after ascertaining that this suit was brought and an application for a receiver made in the Supreme Court, which naturally would lead any attorney to expect that there would be trouble, and that bankruptcy proceedings might take place, especially in view of the fact that Mr. Joseph admits here he knew the firm was insolvent, and was expecting that they would get into difficulty—Joseph started out by telephoning to the clerk of this court to ascertain whether any bankruptcy petition had been filed, and was told that none had been. He sent a clerk down here to the clerk's

office to ascertain whether that took place at any time in the morning.
The morning passed without any such petition being filed. The offices
were closed, and the time came when it was apparent that nothing
more could be done that day, if any one contemplated proceedings,
and word was sent to Mr. Joseph to that effect. The significance of
this depends upon the principle that the filing of a petition in bank-
ruptcy acts as an injunction or a caveat, as the law terms it. It is
notice to the world that bankruptcy proceedings are pending, and any-
body who takes the property of the bankrupt after such a petition is
filed takes it subject to whatever may take place in the bankruptcy
proceedings. Of course, the filing of a petition does not make a man
bankrupt. He may have a defense, and if he puts in a defense, and it
is decided he is not a bankrupt, then any proceedings that a person
takes in reference to his property are not affected by the bankruptcy;
but, on the other hand, if the proceeding results in bankruptcy, then
anybody who has taken the property or interfered with it after the
filing took place holds it subject to the adjudication in bankruptcy,
and to the effect of the proceedings in bankruptcy, which would be an
explanation of why Mr. Joseph wanted to know whether any bank-
ruptcy petition had been filed here on that Saturday morning. After
ascertaining that there had been none filed, and that the office was
closed for the day, he stayed at this store, according to his own state-
ment here, from about 11 until after 2. I think some of the evidence
is that he stayed there longer that day, and during that day what
took place is substantially this, as shown by the evidence on this trial:
The silks, satins, and romaines in the place, substantially—some of
them, at all events; I don't know but all of them—were packed in
trunks by Feinman, and taken away and taken to Baltimore that
night. They were intended, as I understand it, to be applied on ac-
count of Mrs. Korn's indebtedness. There remained some 50 or 60
pieces of piece goods. Some of these were complete, and a number
of them had had a portion cut from them, and used in manufacturing
garments, but a large portion of which remained on the piece; woolen
goods, I think, principally. The question arose what was to be done
with those goods. Joseph had stated, according to Mr. Gilroy, that
it was necessary to put some of this property away, in order that he
(Joseph) should be able to accomplish a settlement with the creditors;
the idea being that after the failure took place—after it became known
that there was a failure—if he had some property with which to make
propositions of settlement, he could accomplish his object. The ques-
tion was what was to be done with these piece goods, and Joseph
said "Who are your spongers," and Gilroy said "Altschul," or the
Perfect Sponging Works, the name under which he did business,
and Joseph advised that these goods be sent there. They were there-
upon packed, and a truckman called in, and they were sent there, and
it also appears that during this day various people in the place took
away smaller quantities. Mr. Von Praag says he took away a silk
dress. Mr. Hardin took away a suit of clothes, and there were vari-
ous other people there who took out rolls under their arms, of
comparatively small amounts. On this same day it seems that in the

morning Mr. Gilroy had sold a lot of made up garments, amounting to about $1,200, to a man named Taylor, and on Monday morning they were taken away, and the result was that on Monday morning, the petition in bankruptcy was filed and the receiver in bankruptcy was appointed, and when the receiver in bankruptcy reached the store there was substantially nothing left of the assets of that store, except, as I understand, goods in process of manufacture, cloth which had been cut up, and was in process of being made into garments, which I think some of the witnesses said were worth about $4,000. All the piece goods, all the unmanufactured goods, and apparently all the manufactured goods were substantially gone. This took place on Monday, the 21st, and I think there is some evidence in the case that there was some telephonic communication that day between Joseph and Altschul, and that Altschul that day—it is for you to say whether it occurred that day—announced that he had a bill against Gilroy & Bloomfield of $1.57 for previous work done as a sponger—a legitimate bill—and he informed them that that must be paid before those goods would be allowed to go out, and at all events it occurred that $150 in cash was paid him before the goods were given out. That was the condition of things on Monday. That was what the receiver, when he went down there, found. Those goods were delivered by Altschul upon order subsequently, and the story of the plaintiff's witnesses in respect to that is substantially this: Cohen, who was a clerk in the firm of Gilroy & Bloomfield—Cohen testified that Joseph sent for him on Wednesday, and asked him to come down to the office, and when he got there Joseph said he wanted to see Gilroy, and the result was that Cohen went to Gilroy in East Orange, and got him to come over to New York. They went to the Cosmopolitan Hotel, and sent for Joseph, and they had an interview there with Joseph, and Joseph said he wanted an order for these goods that had been sent to Altschul, to be used for the purpose of accomplishing this proposed settlement. Thereupon Gilroy wrote on a card an order for them, and gave it to Joseph. This order is dated March 19, 1904, and reads as follows:

"The Perfect Sponging Co.—Gentlemen: Please deliver to bearer the goods sent you for examination.                                          "Gilroy & Bloomfield,
                                                                          "Per Louis K. Gilroy."

It is written on the back of one of their business cards.

Gilroy says that Joseph suggested that he date it back on the 19th, which was the date the goods were sent to the Perfect Sponging Company's place, and Cohen says that he saw the card written and delivered, but he didn't hear the conversation between them, and is not able to identify this as the card, except that he saw a card delivered on that day. Now Joseph denies that he ever received that card, and he denies that he sent Cohen over to Orange, or asked Cohen to get Gilroy to come over here. He says Cohen came to see him, and asked him if he couldn't bring about the payment of some commissions that were due Cohen from the firm of Gilroy & Bloomfield, and he said he didn't see how he could. Thereupon he testifies Cohen went away, and went over to Orange in his own interest, and got Gilroy to come

over to the Cosmopolitan Hotel, and sent for Joseph, to endeavor to accomplish his purpose of getting these commissions settled. Joseph says there was no talk at that interview about giving any order of this kind, and that this order was not given to him there, and he never did receive this order, or take any action under this order. He also calls as a witness Altschul, who says that this order was given to him at his place of business on the 21st of March, the date on which he produces a receipt for the goods. He produces a receipt for goods received on the 21st, that is Monday, March 21, 1904, having entries of nine or ten different lots of goods, which he apparently delivered to different teamsters, and for which he took receipts, and which has at the end of the receipt "Gilroy & Bloomfield, Two cases of cloth, Richard Smith." Mr. Von Praag is also called as a witness, and testifies that he purchased from Feinman certain goods which had been put in two cases, evidence from which you would be justified in drawing an inference that these goods were those sent to Altschul, but which the other side claim were the other goods which were taken off in a trunk to Baltimore. Von Praag produces certain checks given to Feinman, which he says were in payment of these goods, and which checks are dated before the 23d—the 22d, I think. That is to say, gentlemen, if you believe the evidence of Joseph, of Altschul, and of Von Praag, this order was given on the date it bears date, the Saturday, on the same day the goods were sent to Altschul. It was given to some truckman, a man who signed his name here as Richard Smith, so that he could go and get them on Monday the 21st, and he did go and get them Monday the 21st, and they were thereupon sold to Von Praag in such season that he would draw his check in payment on Tuesday the 22d, and all this had taken place before Wednesday the 23d, which is the date on which Gilroy and Cohen say this order was first given. Altschul's own testimony is that the goods were delivered on this order, and he produces this order.

Gentlemen, it is a pretty material point in this case which of these stories is true. If that order was not given until Wednesday, everybody knew that the bankruptcy proceedings had taken place, and that a receiver had been appointed at that time, and if Mr. Joseph and Mr. Gilroy on Wednesday gave this order, and under it took possession of those goods, whether they were intending to give them to Mrs. Korn ultimately, or to hold them for the purpose of forcing a settlement with their creditors, or concealing them for their own advantage, in any way they were doing an illegal act. A receiver had been appointed and had qualified, and the property of this bankrupt estate had then passed to him. The title to it had then passed to him, and no person having knowledge of the condition of affairs had any right to take any property of that firm at that time, or do anything else with it except to hand it over to the receiver. So, as I say, it becomes important for you to determine whether in fact this order was given on the 19th, and was received and the property obtained under it before the bankruptcy occurred, or the parties had knowledge of the bankruptcy, or whether it was issued on Wednesday the 23d.

Upon that point you will notice, in the first place, that, if Gilroy's

story is true, the plaintiff has produced in this case all the corroborative evidence that he can; that is, it is for you to say whether they have not done so. Gilroy says he made this card out at the Cosmopolitan Hotel that Wednesday, and that the only persons present were Joseph and Cohen, and Cohen corroborates Gilroy's story in his testimony, and says he gave Joseph the card, and he went away with it. Joseph says it is not so; that he didn't give it to him at the time or at any time. Now, gentlemen, it is for you to say, under those circumstances, whether, if Joseph's evidence is true, he has produced all the evidence to corroborate his statement that he might produce. If a party to a cause has in his control and can produce in support of his position evidence which in the opinion of the jury he could produce if his story was true, and he omits to do so, the jury is justified in drawing the inference from such omission either that there is no such evidence that can be produced, or, if it was produced, that it would not be favorable to that side. Somebody had that card between the time when Gilroy surrendered it and Altschul received it. Richard Smith, Altschul says, was the teamster who brought this card and delivered it to Altschul, and to whom this property was surrendered. Now, gentlemen, it is a fair question for you to ask in this case why Richard Smith is not called, if he exists. If he exists and has gone away somewhere, where has he gone, or what search has been made to find him? Is it probable that with Von Praag and Altschul friendly to Joseph no such person can be found? This matter was investigated only a few days after the thing occurred. The receiver had the parties up under examination on Thursday of the same week in which he was appointed—three days after he was appointed—and it has been the subject of repeated investigation since. Mr. Joseph is an experienced attorney. He knows the importance of this case. He said on the stand that he said to Feinman that this is a case not only relating to a claim of money against him, but affecting his professional reputation. He is represented here by counsel of experience, and it is for you to say whether he did not know before this trial the importance of supporting his evidence that he never received that paper on Wednesday and if you find that he is not corroborated in the respects in which in your opinion he might have been corroborated if his statement is true, you may give such weight to the omission to produce such evidence as in your opinion such omission ought to receive. You should indeed not give too much weight to the consideration of evidence not being produced. A case should be decided mainly on the actual evidence, but you have a right in passing upon the truth of such a case to take into consideration not only the actual evidence that is in the case, but the omission to produce evidence, if in your opinion it might have been produced, to corroborate the party whose evidence is under consideration.

In addition to this evidence about the goods there is evidence about the cash. Gilroy says he gave Joseph $300 on Saturday, the 19th. He says that Joseph said he needed some cash and some goods in order to accomplish the settlement, and that this $300 was given to Joseph for that purpose. Joseph says it was paid to him by Korn, or paid to

him by Gilroy for Korn, or something of that sort, in payment of his professional services up to that time. Gentlemen, if that is true—if that was paid to him by Korn or for account of the Korns—in payment of his professional services up to that time, the plaintiff in this action cannot recover for that amount. Joseph says that he was never paid anything further by anybody in this case except that he was reimbursed in the sum of $12 by Mr. Gilroy for a little payment he had made to a bookkeeper, I think it was, some employé, and that he was paid $100 later by Altschul, which took the form of a loan, as I understand, and that there were no other cash payments made him at all. Gilroy says he subsequently paid him $250 or $300 to be added to this sum he had previously paid him to make up the fund for settlement with the creditors, and that still later, after he got in the payment from Taylor for about $1,200 worth of goods, he turned over $650 more to Joseph. You will recall the dates of these last two payments which Gilroy says took place certainly after these bankruptcy proceedings occurred and after the receiver was appointed. If his testimony in that respect was correct, those were payments which Gilroy had no right to make, and which Joseph had no right to accept, because both of them knew that that money belonged to the receiver, and they had no business to do anything else with it but turn it over to the receiver. It is for you to say, gentlemen, if you should find in this case against the defendant, in the first place, what was the value of those goods, which are alleged in the complaint to have been worth $4,500, and how much money in fact was advanced by Gilroy, if any, and to base your verdict, if you find one for the plaintiff, upon the actual value of the goods at the time they were turned over, and the actual amount of money paid to Joseph, deducting from it the first $300, if you find that that $300 was paid to him by Korn for a fee, and was not transferred to him by Gilroy as a fund with which to settle with creditors.

Now there is alleged in the answer here as a defense that there was an investigation made. I think there is an order put in evidence. There has not been much said about it by counsel in summing up, but a proceeding was taken in this court to compel the Korns and Gilroy and Feinman and Joseph, I think, to pay back to the receiver or to the trustee, one or the other, this property, or portions of it, and it resulted in an order, which as they say, exonerated Mr. Joseph; that is, an order was entered which refused to direct that Mr. Joseph pay over anything, and that was subsequently modified, and the matter sent back again to the referee. You see this has been a matter of a good deal of examination.

I charge you, gentlemen, as to the effect of that order, that it is not a bar to this suit. Ordinarily, of course, if a man is sued in a lawsuit, and there is a judgment recovered in that case, he cannot sue again for the same thing. The first judgment determines the question. But this was a summary proceeding, based upon the theory that there was clear and conclusive proof that the parties proceeded against in this case had property in their possession. In those cases, where the proof is perfectly clear and substantially decisive, the courts of bankruptcy exercise a summary jurisdiction in such cases, and order that property

be turned over to the trustee; and, if it is not obeyed, the parties under those circumstances are committed to jail for contempt for not obeying the order. But it is perfectly well-settled law that a case may be sufficiently doubtful to prevent the court of bankruptcy from making a summary order in one of those proceedings, although there may be sufficient evidence in the case, such that if it were submitted to a jury on a trial it would justify a verdict against the party, which the court would not feel authorized to set aside. Therefore, it is my opinion that any order made in a proceeding of this kind which does not find the party proceeded against liable to pay over is not a legal bar to a suit brought by a trustee where the evidence can be taken in full, and the jury can pass upon the question.

Now, gentlemen, if the plaintiff's charge is true, you have one of those cases in which it is to be expected that you will have a class of witnesses on all sides who may not be very much relied on. In these cases of bankruptcy failures, where goods are gotten away the day before the petition is filed or a short time before, and they are purchased by people who are in the habit of dealing in goods so obtained, it is not surprising if you find you have to deal with a class of witnesses whose veracity may not be entirely satisfactory. You have to do the best you can in these cases. A trustee in bankruptcy has to do the best he can, and it would not do in such cases if you formed an unfavorable opinion of any of the witnesses to simply say you cannot put any reliance in such evidence, and therefore won't decide anything. It is just this class of cases in which it is the duty of a jury to investigate the case carefully, and to see that justice is done.

Now in this case each of the leading witnesses undoubtedly has a considerable interest in the case. Mr. Joseph has a large interest in this case. Suit is brought against him for a judgment of $5,000 or $6,000, and it is a suit which will affect to some extent his professional standing. Mr. Gilroy has an interest in this case. He has the natural interest of trying to justify himself for whatever has taken place. According to his own statement here, if Joseph isn't responsible for the money he has paid out he is, and so with the goods. Altschul and Von Praag have an interest here. Altschul admits that, knowing that the bankruptcy occurred, he took advantage of the fact that he had this property in his custody to coerce the payment of his claim in full. He stood in the same position as any other creditor, and he has the interest of justifying himself, and defending himself from the charge of willingly taking part in a transaction of this sort. Von Praag is a witness under similar circumstances. The plaintiff claims, in substance, that he is in the business very much like a receiver of stolen goods; that he is in this business of buying up stock from bankrupts, and in aiding them in that manner in cheating their creditors. All these men have these interests, but the mere fact that they may be interested should not prejudice you against them in the slightest degree. You should look at the whole case fairly, candidly, reasonably, bearing in mind the just rights of these defendants, particularly of Mr. Joseph, a man who has been a member of the bar here for many years,

and also taking into view the rights of the plaintiff in this case, who represents the creditors of this firm.

It is all a question of fact. The plaintiff has the burden of proof. He must establish his claim by a preponderance of evidence. This is an important case in the sense that all such cases are important. It is important that in bankruptcy cases the parties on the eve of bankruptcy should not be permitted with impunity to hide their property and to transfer it for the purpose of cheating their creditors, and on the other hand it is important to the defendants in this case that no rash or unjust verdict should be found against them, and that care should be taken to insure that the verdict, if a verdict is found against them, is justified by the evidence.

I have been handed some long requests to charge by each counsel in this case. Some of them are correct, and some of them in my opinion are not correct. Some of them I should modify, and charge as modified. I have endeavored to touch upon the subjects to which they refer, and, if there is any subject referred to in them which I have not touched upon, counsel are free to call it to my attention. But I think I will not go over them at length. It would occupy a long time, and the reading of them to the jury would in my opinion tend to confuse the issues in this case and confuse the jury. I therefore decline to charge in the special language of these requests, or otherwise than as I have already charged in respect to the subjects which are touched upon in these requests to charge.

Mr. Furber: May it please the court, I will ask the court to charge the eighth request, which we have handed up to you specifically. That if a transaction is equally susceptible of two presumptions, one of guilt and one of innocence, the presumption of innocence must prevail.

The Court: I so charge.

Mr. Furber: I ask your honor to charge the ninth and tenth propositions, in view of Mr. Elkus' statement to the jury with reference to the goods being sent to Altschul.

(9) That every sale of personal property, unless accompanied by an immediate and continued change of possession of the property sold, is presumptively fraudulent, and that if the jury believe that the bill of sale of March 18th purported to sell all the property now described in it to Rose Korn, it would have been presumptively fraudulent if the property had been left in the possession of Gilroy & Bloomfield.

The Court: I so charge.

(10) That a delivery of an order on a warehouseman or custodian for personal property in the possession of such custodian, with the intent to vest title to the same for whose account the order is delivered, is a symbolical delivery of the property.

The Court: I so charge.

Mr. Furber: The twelfth I will ask your honor to charge. That it is not essential to the validity of a written bill of sale that it should bear a date, and the date on which a bill of sale is delivered may be proved, irrespective of whether it is dated or not.

The Court: That is so gentlemen; I so charge.

(13) That the law does not require a written bill of sale to be filed,

and filing it or failing to file it in no way affects its validity or effect.

The Court: I so charge. It certainly does not affect it as between the parties.

(19) I would ask your honor to charge the nineteenth. That there is no evidence when the name of the commissioner of deeds was erased from the assignment of accounts of January 19th, and that no inference adverse to Joseph can be drawn from such erasure.

The Court: Gentlemen, it is for you to say whether there is any evidence. I don't recall any evidence to that effect. I think there is no evidence that Joseph had anything to do with the erasure. He said he ordered it to be erased. I think I shall decline to charge the latter part of that request. It is for the jury to say what inference they will draw from it.

Mr. Furber: May I have an exception to the modification.

(20) That such erasure in no way changed the character, validity, or effect of the bill of sale.

The Court: I so charge.

Mr. Furber: I also draw your honor's attention to the order relieving Mr. Joseph from responsibility, and draw your honor's attention to the fact that it was not that we relied upon, but the further provision in that order that it required the Korns, Mrs. Korn and Feinman, to pay over to the receiver the 31 pieces of goods, broadcloth and cashmere, taken from the sponger's, Samuel Altschul, and that is what it required them to do, and they have been charged with that specific property upon that inquiry.

The Court: That order is before you, gentlemen. Give it such weight as it requires.

Mr. Kerfoot: I ask your honor to direct a verdict for the defendant Gilroy for the reason that there has been no proof of the allegations in the complaint of fraudulent intent to hinder, delay, or defraud the creditors of the estate, or that he had any of the assets.

The Court: I deny the motion.

Mr. Kerfoot: I request your honor to charge that the intent to hinder, delay, and defraud the creditors, as alleged in the complaint, is an essential element of this cause of action, and that unless the jury believes from the evidence that such intent actuated Gilroy in these transactions they must find a verdict for Gilroy.

The Court: I so charge.

Mr. Elkus: I ask your honor to charge the jury that in considering the evidence in this case they may take into consideration the fact that the bill of sale which is claimed to be delivered on March 18th bears no date, and was not filed, but remained in the possession of the defendant Joseph until the present time.

The Court: Yes, take it into consideration, gentlemen, with all the other evidence in the case.

Mr. Elkus: I ask your honor to charge the jury that they may, upon the question of whether or not the goods delivered to Altschul were delivered to Altschul for Korn, take into consideration the fact that the goods were stored in the name of Gilroy & Bloomfield, and that the order for the goods which Altschul received is in Gilroy & Bloom-

field's name, and that the receipt which Altschul claims was signed by Richard Smith was also of Gilroy & Bloomfield's goods.

The Court: Yes, gentlemen, it is all a part of the evidence, and proper for you to consider.

Mr. Elkus: I ask your honor to charge the jury that they may take into consideration the testimony elicited from Von Praag as to the financial transactions of Joseph with Von Praag.

The Court: Yes; that is part of the evidence.

Mr. Elkus: I ask your honor to charge that the jury may consider in deciding this case the failure to call Greenberg and Hershman as witnesses on the part of the defendant.

The Court: You may consider it, gentlemen. I shouldn't give it very much weight, it seems to me. I do not see that there is evidence that the defendant has any more special control over Greenberg and Hershman than the other side. No inference should be drawn from the failure to call witnesses, except in those cases where there is evidence which naturally they should produce, and which is in their custody and control to produce.

Mr. Elkus: I ask your honor to charge the jury that in considering the testimony in the case they may take into consideration the fact that on Monday after the petition in bankruptcy had been filed Joseph conversed with Altschul with reference to the merchandise stored at Altschul's place of business, and that Joseph went to Von Praag's place of business with Korn on that day, or whatever day it was they went there.

The Court: Yes; I so charge.

Mr. Elkus: I ask your honor to charge that the jury have the right to disregard the testimony of any witness entirely, if they so desire, if they find that such witness has testified falsely to any material fact.

The Court: Yes, that is so, gentlemen.

Mr. Elkus: I ask your honor to charge the jury that in considering the weight to be given to the evidence of the defendant Joseph in this case they may take into consideration his prior testimony given March 24, 1904, before the commissioner.

The Court: I so charge, gentlemen.

Mr. Palmer: In view of the requests that have been made by Mr. Elkus, I ask your honor to charge the jury in regard to the goods sent to Altschul. They may take into account that it was said by Gilroy in his testimony that the silks and satins sent over on account of Rosie Korn's claim were about the value of $3,000, and it is stated that her claim was between $5,000 and $6,000.

The Court: Certainly.

Mr. Palmer: I ask your honor to charge the jury if they find that the goods sent to Altschul were sent as goods to satisfy the claim of Rosie Korn, it does not matter in whose name they were sent.

The Court: I so charge.

Verdict for the plaintiff for $3,250.

Mr. Kerfoot: I move to set aside the verdict as to the defendant Gilroy, for the reason that it is contrary to the evidence, and for a new trial.

Motion denied. Exception.

Mr. Furber: I move to set aside the verdict on the ground that it is against the weight of evidence.

Motion denied. A stay of 30 days after entry of judgment granted.